# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| NEG MICON USA, INC., | ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 03 C 5851 |
| NORTHERN ALTERNATIVE ENERGY and NAVITAS ENERGY, INC., | ) ) ) | Judge Ronald A. Guzman |
| Defendants. | ) ) ) | |

**FILED**

JAN 2 1 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

---

### NEG MICON USA, INC.'S MEMORANDUM OF LAW
### IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT
### ON NORTHERN ALTERNATIVE ENERGY'S COUNTERCLAIM

---

John M. Touhy
Edward H. Williams
Katherine M. Clark
Mayer, Brown, Rowe & Maw LLP
190 South LaSalle Street
Chicago, IL 60603-3441
(312) 782-0600
(312) 701-7711 – Facsimile

## INTRODUCTION

Defendant Northern Alternative Energy ("NAE") filed a two-count counterclaim against NEG Micon USA, Inc. ("Micon") alleging that Micon breached a contract – referred to as the "Memorandum of Understanding" or "MOU" – by (1) supplying wind turbines to a wind farm project in northern Illinois where NAE was not the project owner and developer and (2) sharing wind data generated during the parties' joint pre-development investigation that was undertaken pursuant to the contract.

Summary judgment should be entered in favor of Micon on both claims for the simple reason that the MOU did not bar Micon from selling turbines in Illinois to other developers and it did not preclude Micon from sharing wind data. Under the contract, NAE was required to purchase Micon turbines if it went forward with a wind farm project in northern Illinois, but it does not state that Micon could not sell wind turbines to other developers. Similarly, it does not say that Micon cannot share the wind data. In fact, it says the opposite, specifying that both parties "will be allowed to share all information associated with these predevelopment activities with other parties." There has been no breach of the contract by Micon.

Furthermore, NAE has not, and cannot, show that any action taken by Micon caused NAE any injury. NAE made the decision not to develop a wind farm in Illinois, although its alter ego, successor and assignee – defendant Navitas Energy, Inc. ("Navitas") – did proceed with a wind farm in Illinois and breached the contract by not using Micon turbines for that project. Thus, there is no conceivable way NAE could have been harmed by Micon's selling of wind turbines to another developer for use in Illinois or by its providing Illinois wind data to another developer. NAE was not interested in developing a wind farm in Illinois, aside from handing the opportunity created by the joint pre-development investigation to Navitas and then

attempting to strip Micon of its rights under the contract by asserting that Navitas, not NAE, was proceeding with the project.

Moreover, NAE's damages are entirely speculative and bear no relationship to the alleged breaches of the contract by Micon. NAE has presented a damages expert, Walter Thompson, to quantify its damages. In his effort to do so, Thompson prepared a "pro forma" calculation of the revenue streams that he claims NAE might have received had it been the developer and owner of a hypothetical wind farm project at some unspecified location in Illinois. His calculations are entirely speculative and have nothing to do with NAE's claims that Micon breached the contract by selling turbines to another developer in Illinois or by sharing wind data.

Finally, this Court should also grant summary judgment on the declaratory relief aspects NAE's counterclaim. Again, selling turbines in Illinois and sharing wind data are not breaches of the contract, and there can be no causal connection between these alleged breaches and any harm. Further, there are no ripe disputes between NAE and Micon and therefore declaratory relief is inappropriate.

## FACTUAL BACKGROUND

NAE is a developer of wind farms. Stmt. ¶1 (Ex. B, ¶5).[1] Micon is a supplier of wind turbines for wind farms. Stmt. ¶2 (Ex. B, ¶4). Micon and NAE signed the MOU with an effective date of October 21, 1999. Stmt. ¶5 (Ex. A, ¶ 8; Ex. B ¶8; Ex. C). Pursuant to the MOU, the parties agreed to participate in a joint pre-development investigation of potential candidate sites for a wind farm in Illinois. Stmt. ¶6 (Ex. C, ¶1). The parties agreed that Micon would install a meteorological or "met" station that would measure the wind resource in a certain area. Stmt. ¶6 (Ex. C, ¶1). Micon did in fact install such a met station near Princeton, Illinois.

---

[1] All cites to "Stmt." are to Micon's Local Rule 56.1 Statement filed contemporaneously with this memorandum and the supporting exhibits attached to the Statement.

Stmt. ¶6 (Ex. E at 433-34). NAE, meanwhile, agreed to equip an existing communication tower with similar equipment to measure the wind resource and, in performance of its obligation under the MOU, NAE established a met station near Compton, Illinois. Stmt. ¶7 (Ex. C, ¶1; Ex. F at 230). The parties also jointly retained the services of a consultant (Tom Factor) to investigate candidate sites for a wind farm. Stmt. ¶8 (Ex. G at 30-31, 182-83; Ex. E at 397-98).

The MOU provided that if NAE, a wind farm developer, decided to go forward with a project at a site arising out of the investigation, then NAE would purchase wind turbines from Micon, a wind turbine supplier. Stmt. ¶9 (Ex. C, ¶2). Paragraph 2 of the MOU states: "Under this agreement NAE would be the project developer and owner and NEG Micon would be the exclusive supplier of the wind turbines for any project at both of [the] above-mentioned candidate sites resulting out of the pre-development investigation." Stmt. ¶9 (Ex. C, ¶2). The "above-mentioned candidate sites" were the sites around the Princeton and Compton met towers. Stmt. ¶9 (Ex. C, ¶2).

Navitas is an affiliate of NAE. Navitas was formed as a wholly-owned subsidiary of NAE in 2000. Stmt. ¶13 (Ex. H at 60-65). In 2003, Navitas developed the Mendota Hills wind farm 1.5 miles from the Compton met station established pursuant to the MOU. Stmt. ¶13 (Ex. I at 55-56; Ex. J at 54-55). In proceeding with the development of a wind farm, Navitas admits that it used data generated by the Compton met tower. Stmt. ¶13 (Ex. J at 52). Data from the Princeton met tower was also available to NAE/Navitas. Stmt. ¶14 (Ex. Q at 20-21). Despite Micon's demands, Navitas refused to use Micon wind turbines for the Mendota Hills wind farm, choosing instead to use turbines supplied by Gamesa Eolica, an affiliate of Navitas' new majority owner, Gamesa Energia. Stmt. ¶13 (Ex. I at 56). Micon has alleged in its pleadings

3

that both NAE and Navitas are liable to Micon for the failure to use Micon turbines for the Mendota Hills wind farm.

Another wind farm is currently being developed in northern Illinois, referred to as the Crescent Ridge wind farm, which is located near Princeton, Illinois. Stmt. ¶15 (Ex. L at 29-31). Over time, various developers have been involved in this project. The current developer is Eurus. Stmt. ¶15 (Ex. L at 31). In 2004, Micon sold turbines to Eurus for use at the Crescent Ridge wind farm. Stmt. ¶15 (Ex. L at 29-31). Previously, Micon had provided wind data generated by the Princeton met station to the developers of the Crescent Ridge wind farm pursuant to an exclusivity contract that required them to purchase wind turbines from Micon if they proceeded with a wind farm, an obligation they honored. Stmt. ¶15 (Ex. L at 31; Ex. M at 126-127, 132).

## ARGUMENT

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1209 (7th Cir. 1993). Although a court must draw all justifiable inferences in the non-movant's favor, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). For breach of contract claims, courts routinely grant summary judgment where the claim is based on an unambiguous contract term or where there is no genuine issue of fact regarding the meaning of the contract. *E.g.*, *Grum v. Pneumo Abex Corp.*, 163 F.3d 411, 419 (7th

Cir. 1998); *Hickey v. A.E. Staley Mfg.*, 995 F.2d 1385, 1391-92 (7th Cir. 1993). Here, there is no question that Micon was free to sell wind turbines to other developers in northern Illinois and that it could share the wind data generated by the Princeton and Compton met stations with third parties.

## I. MICON IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I.

Although NAE's allegations lack clarity, its seems that count I of NAE's counterclaim is that NAE was entitled to be the owner and developer of any wind farm project in Illinois for which Micon supplied turbines and that, therefore, Micon breached the contract when it sold wind turbines to another developer, Eurus, for use in northern Illinois (the Crescent Ridge project). The essential allegations of count I are as follows:

> [P]laintiff has a monetary obligation to NAE that NAE will be the developer and owner, in an amount to be determined at trial, for its involvement in wind power projects in Northern Illinois . . . .
>
> [B]y plaintiff being involved in other wind projects in Northern Illinois, without using NAE as the project developer and/or owner, plaintiff has breached the MOU.
>
> As a result, NAE has been damaged and plaintiff has a monetary obligation to NAE for all fees related thereto, in an amount to be determined at trial.

Stmt. ¶¶ 16-17 (Ex. A, ¶¶ 1, 5, 6).

To survive summary judgment, NAE must come forward with evidence on each element of its breach of contract claim. NAE must demonstrate (1) a valid and enforceable contract; (2) performance of its contractual duties; (3) breach of contractual duties by Micon; and (4) resulting damages to NAE. *Normand v. Orkin Exterminating Co.*, 1998 WL 704066, at * 3 (N.D. Ill. 1998). NAE cannot do so. The MOU does not impose a duty on Micon to refrain from selling turbines in Illinois to projects established by developers other than NAE. Moreover, Micon's 2004 sale of turbines for the Crescent Ridge project could not have caused an injury to NAE

because NAE had independently determined not to move forward in that area shortly after the 1999 contract was executed.[2]

### A. The MOU Does Not Prohibit Micon From Selling Turbines To Other Developers In Illinois.

The language of the MOU discussing NAE as the project owner and developer is found in paragraph 2 of the MOU, stating, "Under this agreement NAE would be the project developer and owner and NEG Micon would be the *exclusive supplier* of the wind turbines for any project at both of [the] above-mentioned candidate sites resulting out of the pre-development investigation." (emphasis added). Stmt. ¶9 (Ex. C, ¶2). NAE's claim is that Micon breached this provision when it supplied another developer with wind turbines in northern Illinois. *Id.* NAE's claim is contrary to the contract.

As detailed in Micon's pleadings, the contract certainly does provide that Micon would be the "exclusive supplier" for any project arising from the pre-development investigation. Stmt. ¶ 9 (Ex. C, ¶2). However, it does not state that NAE would be the "exclusive" owner and developer for any project arising from the pre-development investigation. Stmt. ¶ 9 (Ex. C, ¶2). The fact that the parties used the word exclusive with respect to Micon but not NAE is telling. *Delta Mining Corp. v. Big Rivers Electric Corp.*, 18 F.3d 1398, 1405 (7th Cir. 1994) ("the doctrine of *expressio unius est exclusio alterius* instructs that when certain matters are mentioned in a contract, other similar matters not mentioned were intended to be excluded"). When the parties drafted the agreement, they made clear that the exclusivity requirement applied only to the obligation to use Micon turbines.

---

[2] In addition, NAE has not even pleaded that it performed its contractual duties under the MOU. This alone constitutes grounds for summary judgment.

6

In *Delta Mining*, the contract provided that only the buyer had the right to demand that the seller make-up for any undershipments of coal delivered pursuant to the parties' contract. *Id.* at 1404-05. The seller, however, claimed that it also had the right to force the buyer to take delivery of additional coal to make-up for undershipments. *Id.* The court rejected that theory, holding: "[T]he contract means what it unambiguously says: [the buyer], and [the buyer] only, had the option of requiring makeup of [the seller's] unexcused undershipments." *Id.* at 1405. The court also noted that "whether the Agreement is 'harsh' or not is irrelevant to the questions of law raised by its application. That a contract may be harsh does not detract from its clarity." *Id.*

Here, NAE agreed to give Micon the right to be the exclusive supplier of wind turbines if a wind farm was developed in northern Illinois in exchange for the consideration provided by Micon under the contract, specifically, its participation in and funding of the pre-development investigation. Stmt. ¶9 (Ex. C, ¶¶1-2). However, Micon did not agree to refrain from selling wind turbines to other developers in northern Illinois, nor did it agree that it would somehow install NAE as the owner and developer for any projects in Northern Illinois. *Id.*[3]

Paragraph 3 of the MOU confirms the parties' intention that Micon will be free to work with other developers. In paragraph 3, the MOU provides, "Both NEG Micon and NAE will be allowed to share all information associated with these pre-development activities with other parties." Stmt. ¶10 (Ex. C, ¶ 3). NAE agreed that Micon could share the wind data with other developers which NAE knew would assist other developers pursuing projects in Illinois. It would make no sense for the agreement to permit Micon to share the wind data with other

---

[3] Of course, Micon, a wind turbine supplier, does not have the power to make wind farm owners and developers turn their projects over to NAE and, to the extent that NAE is claiming that Micon had an obligation to do so, that is absurd and not supported by the language of the contract.

7

developers but at the same time bar Micon from selling wind turbines to them. "A written contract should be given a construction that harmonizes all the various parts of the contract so that no provision is conflicting with, or repugnant to, or neutralizing of any other." *Binks Mftr. Co. v. National Presto Industries, Inc.*, 709 F.2d 1109, 1116 (7th Cir. 1983). Micon could share the data and it could supply other developers with turbines.

It should be noted that NAE cannot offer any extrinsic evidence that would alter the plain meaning of the agreement. Greg Jaunich, who signed the MOU on behalf of NAE, says he has no recollection of the MOU and therefore cannot provide any testimony about the parties' intent. Stmt. ¶ 11 (Ex. D at 174-75, 442-43). Mark Eilers, of Micon, testified that the intent was that Micon would be permitted to pursue projects with other developers. Stmt. ¶12 (Ex. E at 99-100) ("Was there an agreement that NAE was going to be the exclusive developer under the Memorandum of Understanding? . . . No."). Eilers' testimony confirms what the MOU already provides – there was no agreement that NAE would be the owner and developer for *any* project in northern Illinois established by non-parties to the contract who decide to use Micon turbines or that Micon could not sell turbines to those independent developers. Summary judgment should be entered on count I because there was no breach of the contract.

### B. NAE's Claim Also Fails Because It Cannot Establish Causation.

NAE has absolutely no evidence that Micon's alleged breach (its involvement in the Crescent Ridge project) had any effect on NAE's ability to develop projects in Illinois. Navitas (the alter ego, successor and assignee of NAE) did proceed with a project that is located 1.5 miles from the Compton met station and therefore within the area covered by the contract. Stmt. ¶ 13 (Ex. I at 55-56; Ex. J at 54-55). However, neither NAE nor Navitas pursued a project near the Princeton met station. Stmt. ¶ 14 (Ex. G at 25-27; Ex. F at 97-98). To the contrary, NAE's witnesses testified that very early on they decided they were only interested in the area around

8

the Compton met station. Stmt. ¶14 (Ex. G at 25-27). NAE, on its own, determined that it was not interested in developing a wind farm near the Princeton met station, which is located in Bureau County. Wes Slaymaker, a former NAE and Navitas employee, explained the sequence of events leading to the decision to pursue only Compton:

> Q. What -- what steps did you take after the initial meeting regarding the Illinois project?
>
> A. I looked at maps for quite a while and probably also ordered the county plat book which shows all of the landowners and looked at -- I would have tried to research I think the transmission line proximity. Don't remember a whole lot, you know, other than the mapping work. Something made me decide the Compton project was a better one to pursue than the one for the South and Bureau County [which includes Princeton], and I don't remember what that was.
>
> Q. When -- when did you decide that?
>
> A. Fairly early on because we never decided to pursue the other site. Something made, you know, me. And I certainly presented it to Greg [Jaunich] and Brian [Lammers] to decide that the Compton was the better site to pursue at a very early stage, and we always pursued Compton.

Stmt. ¶ 14; (Ex. G at 25-27).

Similarly, John Jaunich, who has been CEO of NAE since 2001, stated that in 2001 and 2002, he didn't consider other projects in Illinois because "I was very business [sic] with other project." Stmt. ¶ 14; Ex. G at 97-98. He also stated in an affidavit that NAE ceased pursuing opportunities in Illinois altogether in 2001. Stmt. ¶14 (Ex. K, ¶ 9).

The predevelopment investigation contemplated by the contract convinced NAE to pursue Compton, not Princeton. Stmt. ¶ 13-14 (Ex. G at 25-27; Ex. J at 54-55). Micon's alleged breach – dealing with the Crescent Ridge developers and providing them with turbines in 2004 – could not have injured NAE because NAE had already decided not to pursue Princeton. Micon

9

did not stand in NAE's way. Therefore, even if dealing with the Crescent Ridge developers is somehow deemed to be a breach of the MOU, that breach did not cause any injury to NAE.

## II. SUMMARY JUDGMENT SHOULD ALSO BE ENTERED ON COUNT II.

In count II, NAE seeks damages for the sharing of wind data by Micon. NAE's claim is pled in the alternative:

> [I]f it is determined pursuant to the confidentiality provision in the MOU, NAE could not or [sic] share information with other parties, this Court should then declare that plaintiff also could not share information associated with pre-development activities with other parties, and that consequently, plaintiff has a monetary obligation to NAE, in an amount to be determined at trial, for improperly sharing such information with other parties.

Stmt. ¶16 (Ex. A, Count II, ¶ 1). NAE also claims Micon "is in breach of the confidentiality provision by sharing the information with other parties without NAE's knowledge or consent" and that "[a]s a result, NAE has been damaged and plaintiff has a monetary obligation to NAE for all fees related to plaintiff's breach of the confidentiality provision contained in paragraph 3 of the MOU. . . ." Stmt. ¶ 17 (Ex. A, Count I, ¶¶ 3-4).

As an initial matter, NAE has misunderstood Micon's pleading. Micon did not allege that NAE was barred from sharing wind data with other parties. Micon's pleading stated that it was a breach of the MOU and a violation of the covenant of good faith and fair dealing for NAE and Navitas to develop a wind farm near Compton without using Micon as the turbine supplier. Put another way, it was wrong for them to use the wind data gathered pursuant to the joint pre-development investigation in connection with *their* development of a wind farm near Compton without using Micon turbines. To add insult to injury, they instead used turbines manufactured by Gamesa Eolica, a competitor of Micon and the sister corporation of Gamesa Energia, the new controlling shareholder of Micon, with the result that Micon was not a part of the first wind farm developed in Illinois. Micon has never claimed that it would be a breach of the contract for NAE

to share the wind data with some other party – the issue is the use of the wind data in a Compton, Illinois project by these defendants and the exclusion of Micon as the turbine supplier.

Moreover, NAE's misconceived alternative claim fails for the same two reasons count I fails: there was no breach of the contract and the alleged breach did not cause NAE any injury. First, the MOU is clear: "Both NEG Micon and NAE will be allowed to share all information associated with these pre-development activities with other parties." Stmt. ¶9 (Ex. C, ¶2). While this Court previously concluded in connection with its denial of defendants' motions to dismiss that paragraph 2 of the MOU was ambiguous, paragraph 3 could not be more plain. Either party is allowed to share any information associated with the pre-development activities contemplated by the MOU. Thus, it was not a breach of the MOU for Micon to share wind data from the Princeton or Compton met stations.[4]

Second, the fact that Micon shared Princeton wind data with the Crescent Ridge developers did not cause NAE any injury. Again, shortly after the execution of the MOU, NAE determined that it had no interest in developing a wind farm near Princeton, focusing exclusively on Compton and then walking away from Illinois altogether. Stmt. ¶14 (Ex. G at 25-27; Ex. K, ¶9).

In short, NAE cannot establish that Micon breached the contract or that its alleged breach caused NAE any injury; therefore, summary judgment on count II should be granted.

## III. NAE'S DAMAGES ARE WHOLLY SPECULATIVE.

For count I damages, NAE states it "is entitled to all fees resulting from plaintiff's involvement in other wind power projects in Northern Illinois as a supplier." In count II, NAE

---

[4] The Court need not look to the testimony of witnesses regarding the intent of paragraph 3 since NAE's claim is barred by its plain language. Nonetheless, it should be noted that there has been no testimony from any witness to indicate that paragraph 3 means something other than what it says – the parties were free to share pre-development investigation information with third parties.

11

(in equally vague terms) pleads that it is entitled to "all fees related to plaintiff's breach of the confidentiality provision contained in paragraph 3 of the MOU. . . ." Stmt. ¶ 16-17 (Ex. A, Count II, ¶ 4). Nowhere does NAE describe what types of fees it is claiming or how it would have earned those fees if Micon had not (allegedly) breached the contract.

In its answers to interrogatories, NAE states that its damages will be addressed by its damages expert, Walter Thompson. Stmt. ¶ 18; (Ex. N, No. 2). But Thompson's expert reports and deposition testimony do not explain how NAE was damaged as a result of Micon's sale of wind turbines to the Crescent Ridge developers or as a result of Micon's sharing of wind data. In his effort to quantify NAE's damages, Thompson submits a "pro forma" calculation reflecting a hypothetical wind farm that might possibly have attracted equity and debt lenders for some unidentified site in Illinois. Stmt. ¶18; (Ex. O; Ex. P at 90-91). He then calculates a hypothetical development fee for NAE as the developer of this non-existent project and the amounts NAE might have received as the owner of this non-existent wind farm with non-existent expenses and non-existent revenues. Stmt. ¶18; (Ex. O; Ex. P at 90-91). Since none of these items exist, he make assumptions that he admits have nothing to do with the actual experience of the actual owner and developer at Crescent Ridge, making it clear that he does not "care" what was spent in developing the Crescent Ridge project. Stmt. ¶19; (Ex. O; Ex. P at 99). In fact, his "model is not created to model any existing project or to be a final model of any proposed project." Stmt. ¶19; (Ex. O; Ex. P at 90). Furthermore, most of his assumed data points are numbers that came out of his "brain" or was information "utilized out of his mind for this project." Stmt. ¶19; (Ex. O; Ex. P at 87-89, 122).[5]

---

[5] Micon's summarization of Thompson's testimony should not be construed as an acceptance of any of Thompson's testimony. To the contrary, Micon reserves it right to challenge the presentation of any testimony by Thompson at trial.

"The evidence of damages offered by Plaintiff cannot be remote, speculative or uncertain." *Transportation & Transit Assoc., Inc. v. Morrison Knudsen Corp.*, 1999 WL 116229, at * 4 (N.D. Ill. 1999) (granting summary judgment where plaintiff's alleged lost profits damages were "too speculative"). Thompson's damages opinions – the only evidence of NAE's damages as disclosed in its answers to interrogatories – are classic examples of pure speculation. There is no link to the facts of this case, and Thompson never explained how any act by Micon caused NAE to lose the amounts presented in his amorphous damages model. Stmt. ¶20; (Ex. O; Ex. P 29, 54-55). NAE has failed to prove the existence of actual, non-speculative damages caused by Micon's alleged breaches of the contract, and, for this reason also, summary judgment should entered against NAE on both counts of its counterclaim.

## IV. DECLARATORY JUDGMENT IS NOT WARRANTED.

NAE also seeks declaratory relief. NAE's requested declaration is remarkable. It wants this Court to declare that "NAE will be the project owner and developer for wind power projects plaintiff is and will be involved in Northern Illinois." Stmt. ¶16 (Ex. A, Count I, ¶1). Even assuming that NAE would limit its request to wind farms where Micon is the wind turbine supplier, NAE does not explain how this Court is to go about removing the legitimate owners and developers from their projects. NAE's request for this declaratory relief should be denied because this Court does not have the power to transfer wind farm projects to NAE and, of course, Micon itself could not do such a thing either.

In addition, NAE's request for declaratory relief should also be denied because both of its breach of contract claims fail. As demonstrated above, NAE cannot show that Micon had a contractual obligation to refrain from selling turbines to other developers in Illinois or that Micon could not share the wind data.

Finally, NAE's declaratory relief demand also fails because it cannot show the existence of an actual controversy and that it is "in immediate danger of sustaining a direct injury as a result of defendants' putatively illegal conduct." *Vickers v. Henry County Sav. & Loan Assoc.*, 827 F.2d 228, 231 (7th Cir. 1987). NAE has not pleaded any such immediate danger, nor can it come forward with any evidence of such immediate danger.

## CONCLUSION

For the foregoing reasons, Micon respectfully requests that the Court grant Micon summary judgment on NAE's counterclaim in its entirety and with prejudice.

Dated: January 21, 2005                       NEG MICON USA, INC.

By: *[signature]*
One of Its Attorneys

John M. Touhy
Edward H. Williams
Katherine M. Clark
Mayer, Brown, Rowe & Maw LLP
190 South LaSalle Street
Chicago, IL 60603-3441
(312) 782-0600
(312) 701-7711 – Facsimile

14

## CERTIFICATE OF SERVICE

Katherine M. Clark, an attorney, hereby certifies that a true and correct copy of the foregoing **NEG MICON USA, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON NORTHERN ALTERNATIVE ENERGY'S COUNTERCLAIM** was served on January 21, 2005, upon the following parties Via Overnight Mail:

Brian A. Burns, Esq.
Duval & Stachenfeld LLP
300 East 42nd Street, 3rd Floor
New York, New York 10017
Telephone: (212) 883-1700
Facsimile: (212) 883-8883

Rachna B. Sullivan, Esq.
Rider Bennett, LLP
33 South Sixth Street
Suite 4900
Minneapolis, MN 55402
Telephone: (612) 340-8900
Facsimile: (612) 340-7900

*/s/ Katherine M Clark*